UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ASPRO MECHANICAL CONTRACTING, INC.,
BLUEPRINT PLUMBING LLC, CARDOZA
CORP., CRESCENT CONTRACTING CORP.,
GENERAL PLUMBING CORP., LOUIS L.
BUTTERMARK & SONS, INC., PACE
PLUMBING CORP., PAR PLUMBING CO., INC.,
PARAMOUNT PLUMBING COMPANY OF N.Y.,
INC., PARKVIEW PLUMBING & HEATING
INC., RIEHM PLUMBING CORP., TAGGART
ASSOCIATES CORP. and V. C. VITANZA SONS,
INC.,

                              Plaintiffs,

              - against -

UNITED ASSOCIATION OF JOURNEYMEN
AND APPRENTICES OF THE PLUMBING AND
PIPE FITTING INDUSTRY OF THE UNITED
STATES AND CANADA and JAMES CAHILL, in
his official capacity as an International
Representative of the UNITED ASSOCIATION
OF JOURNEYMEN AND APPRENTICES OF
THE PLUMBING AND PIPE FITTING
INDUSTRY OF THE UNITED STATES AND
CANDADA, and in his individual capacity,

                              Defendants.



Index No. 08-cv-05612

**AMENDED COMPLAINT**

---

Plaintiffs Aspro Mechanical Contracting, Inc., Blueprint Plumbing LLC, Cardoza

Corp., Crescent Contracting Corp., General Plumbing Corp., Louis L. Buttermark &

Sons, Inc., Pace Plumbing Corp., Par Plumbing Co., Inc., Paramount Plumbing

Company of N.Y., Inc., Parkview Plumbing & Heating Inc., Riehm Plumbing Corp.,

Taggart Associates Corp., V. C. Vitanza Sons, Inc., (collectively "plaintiffs"), by their

attorneys Kauff McClain & McGuire LLP, complaining of defendants United

Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada ("UA" or "United Association") and James Cahill ("Cahill") in his official capacity as an International Representative of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada and in his individual capacity (collectively "defendants") herein, allege as follows:

## JURISDICTION AND VENUE

1.      This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of suit, including reasonable attorneys fees, against defendants for the injuries sustained by plaintiffs in their business and property by reason of defendants' violations, as hereinafter alleged, of certain antitrust laws, more particularly, Sections 1 and 2 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended (15 U.S.C. §§ 1 and 2), commonly known as the Sherman Act. This action is also instituted to secure injunctive relief against defendants to prevent further threatened harm and damage to plaintiffs. This Court has jurisdiction over the subject matter and the parties pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1337.

2.      This action also arises from defendants' unlawful activity in violation of New York General Business Law §§ 340 et seq., commonly known as the Donnelly Act. By this action, plaintiffs seek (a) monetary damages against defendants for its unlawful activity in the form of restitution and (b) injunctive relief to prevent

4843-6207-8466.1

defendants from continuing or reinstituting their anticompetitive conduct. The Court has supplemental jurisdiction over the New York claims pursuant to 28 U.S.C. § 1367.

3.     Venue is appropriate in this Court pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 in that the defendants named herein are found, transact business, have an agent or maintain an office within the district, the claims arose in this district, and the defendants performed acts within this judicial district in furtherance of the conspiracies alleged herein.

## THE PARTIES

4.     Plaintiffs are privately held plumbing contractors, each incorporated under the laws of the State of New York, or qualified to do business in New York.

5.     Defendant UA is an international union whose constituent local unions represent and negotiate collective bargaining agreements on behalf of plumbers and pipefitters who have designated such local unions as their collective bargaining representatives. The UA is a member of, and represents the interests of its affiliated local unions in the AFL-CIO, an organization comprised of national and international unions that represents the interests of organized labor in the United States and Canada. On information and belief, the UA has, on occasion, also negotiated collective bargaining agreements directly with individual employers and multi-employer bargaining associations representing employers.

6.     Defendant Cahill is employed by the UA as its international representative ("IR") for New York.

4843-6207-8466.1

## RELATED NON-PARTY PERSONS AND ENTITIES

7.    William Johnston, also known as William Johnson ("Johnston"), is a master plumber licensed by the City of New York; his license number is P001324.

8.    ASA Associates of New York, Inc. ("ASA"), is a for-profit corporation organized under the laws of the State of New York; it is also a plumbing contractor licensed by the City of New York to perform plumbing work in New York City. On information and belief, its president and chief executive officer is Johnston.

9.    Riverdale Associates LLC ("Riverdale"), is a domestic limited-liability company organized under the laws of the State of Nevada; on information and belief, it is authorized to do business in New York and does business in New York City as a plumbing contractor. On information and belief, its president and chief executive officer is Johnston.

10.    Plumbers Union Local 1 ("Local 1"), is a labor organization affiliated with the UA; it represents and negotiates collective bargaining agreements in New York City on behalf of journeymen plumbers, apprentice plumbers and helper plumbers who have designated it as their collective bargaining representative.

11.    The Association of Contracting Plumbers of the City of New York ("Association" or "ACP"), is a multi-employer bargaining association representing the interests of approximately 60 plumbing contractors performing plumbing work in New York City; plaintiffs are Association members.

## APPLICABLE COLLECTIVE BARGAINING AGREEMENTS

12.    The Association and Local 1 negotiated a collective bargaining agreement ("CBA") effective as of July 1, 2004 and expiring by its term on June 30, 2007; the Association and Local 1 extended that agreement in 2007 to June 30, 2010. The agreement is known as the "A Agreement"; it covers all new construction involving plumbing installations in New York City and recites the terms and conditions of employment of the "A" journeymen and apprentice plumbers employed to work on new construction projects.

13.    The Association and Local 1 negotiated a second collective bargaining agreement effective as of October 1, 2005, and expiring by its terms on September 30, 2009. This agreement is known as the Mechanical Equipment and Service Agreement, or the "MES Agreement"; it covers all plumbing work defined as service, repair or replacement work performed by Local 1-represented plumbers in New York City, and recites the terms and conditions of employment of the "MES" journeymen and helper plumbers employed to perform service and replacement or repair work.

14.    Effective July 1, 2004, the A Agreement required contractors subject to its terms to pay the following wages and to make the following contributions to fringe benefit funds for journeymen plumbers:

|      | Wages | Fringe Benefit Contribution | Total Package |
|------|-------|------------------------------|---------------|
| 2004 | $41.91 | $27.25 | $69.16 |
| 2005 | $44.41 | $28.45 | $72.86 |
| 2006 | $45.41 | $28.85 | $74.26 |

15.    Effective July 1, 2004, the A Agreement required contractors subject to its terms to pay the following wages and to make the following contributions to fringe benefits funds for apprentice plumbers:

|         | Wages | Fringe Benefit Contribution | Total Package |
|---------|-------|------------------------------|---------------|
| 2004*   | $10.75 | $2.61 | $13.36 |
| 2005**  | $10.78 | $2.58 | $13.36 |
| 2006*** | $10.78 | $2.58 | $13.36 |

*Apprentice wages range from $10.50 to $31.46 over the five-year term of apprenticeship.
**Apprentice wages range from $10.78 to $32.08 over the five-year term of apprenticeship.
***Apprentice wages range from $10.78 to $32.96 over the five-year term of apprenticeship.

16.    Effective July 1, 2007, the A Agreement requires contractors subject to its terms to pay the following wages and to make the following contributions to fringe benefits funds for journeymen plumbers:

|  | Wages | Fringe Benefit Contribution | Total Package |
|---|---|---|---|
| 2007 | $47.66 | $29.60 | $77.26 |

17.    Effective July 1, 2007, the A Agreement requires contractors subject to its terms to pay the following wages and to make the following contributions to fringe benefits funds for apprentice plumbers:

|  | Wages | Fringe Benefit Contribution | Total Package |
|---|---|---|---|
| 2007* | $14.00 | $2.58 | $16.58 |

*Apprentice wages range from $14.00 to $34.08 over the five-year term of apprenticeship.

18.    Effective October 1, 2005, the MES Agreement required contractors subject to its terms to pay the following wages and to make the following contributions to fringe benefit funds for MES Journeymen:

|  | Wages | Fringe Benefit Contribution | Total Package |
|---|---|---|---|
| 2005* | $27.92 | $11.79 | $39.71 |

*Journeymen wages increased $.75 every six months through September 30, 2008.

19.    Effective October 1, 2005, the MES Agreement required contractors subject to its terms to pay the following wages and to make the following contributions to fringe benefit funds for Helpers:

|  | Wages | Fringe Benefit Contribution | Total Package |
|---|---|---|---|
| 2005* | $10.00 | $5.50 | $15.50 |

*Helper wages ranged from $10.00 to $15.00 for the five levels of classification.

20.    Effective April 1, 2007, the MES Agreement requires contractors subject to its terms to pay the following wages and to make the following contributions to fringe benefit funds for MES Journeymen:

|  | Wages | Fringe Benefit Contribution | Total Package |
|---|---|---|---|
| 2007 | $29.50 | $12.43 | $41.93 |

21.    Effective April 1, 2007, the MES Agreement requires contractors subject to its terms to pay the following wages and to make the following contributions to fringe benefit funds for Helpers:

|        | Wages | Fringe Benefit Contribution | Total Package |
|--------|-------|------------------------------|---------------|
| 2007*  | $10.10 | $6.75 | $16.85 |

*Helper wages range from $10.00 to $16.07 for the five levels of classification.

22.    In the A Agreement, the Association and Local 1 agreed to create a committee ("Target Committee") staffed by an equal number of representatives appointed by Local 1 and the Association and gave it the power to change certain contractual terms and conditions when contractors request lower labor costs to assist them in successfully bidding for plumbing work against low wage, non-union competition on otherwise non-union projects.

23.    At the request of an individual contactor, the Target Committee reviews a request for changes in the A Agreement that effectively lowers labor costs by permitting the employ of MES journeymen and helpers in place of A journeymen and apprentices, or by allowing the use of more helpers or apprentices than are normally allowed by the A Agreement.  Before addressing a contractor's request, however, the Target Committee investigates the particular project involved; decides whether to grant all or some of the relief sought; and communicates that decision to all plumbing contractors who are signators to the Local 1 Agreement (whether or not they are Association members), before the bidding process is concluded.  This process effectively gives all union plumbing contractors in New York City the ability to submit a

4843-6207-8466.1

competitive bid for a targeted project, based on the published decision of the Target Committee.

24.    The UA and the Association also executed an agreement effective as of October 4, 2004, called the "UA Residential Agreement," that was designed to encourage Association members to attempt to recover segments of the residential market they had lost, and that were then dominated by non-union plumbing contractors, which paid lower wages and provided fewer (or no) benefits than were provided by union plumbing contractors.

25.    The UA Residential Agreement has three "schedules" of wages, benefits and work rules that are more advantageous for contractors than the wages, benefits and work rules provided for in the A Agreement or MES Agreement. The first schedule is known as the "Basic Agreement" and provides for specific wages, benefits and work rules for a particular class of project, as do Schedules A and B. A fourth option available to plumbing contractors, known as "Site Specific," has no published wages, benefits or work rules and the UA and the Association agreed that those wages, benefits and work rules would be decided by the UA on a case by case basis.

26.    Contractors who are signators to the UA Residential Agreement ("Signatory Contractors") either through the Association or independently of the Association, and who wish to utilize the Basic Agreement, Schedule A rates and conditions or Schedule B rates and conditions may bid for eligible work based on the Basic Agreement or Schedule A or B rates "as of right," without further permission from the UA.

4843-6207-8466.1

27.    Prior to sometime in 2007, Signatory Contractors who wished to proceed with a Site Specific schedule of rates and conditions had to request Cahill, the United Association's IR, to agree to rates or conditions different from those set out in the Basic Agreement or in Schedules A and B.

28.    In or about the summer of 2003, the Association learned that Cahill had granted permission to ASA to bid a project at 333 East 102nd Street in Manhattan, New York (the "Hampton Court Project") under the UA Residential Site Specific schedule and that ASA had been awarded the contract for all the plumbing work at that site. Although the contract was awarded to ASA, on information and belief, Riverdale performed the work and paid the plumbers. The Association and its members, including plaintiffs, were not aware that this particular project was eligible for consideration under the UA Residential Agreement nor, on information and belief, was Local 1 aware that the job was eligible for consideration under the UA Residential Agreement. Some or all of the plaintiffs would have submitted bids had they known of the concessions granted by Cahill for that project.

29.    The Association, at its request, met with representatives of the UA to express its concern that a Site Specific agreement was reached with ASA for the Hampton Court Project without Signatory Contractors knowing that a site specific formula was available at the time some of them submitted their bids to the developer of that project. Cahill, one of the UA representatives at the meeting, insisted that a Local 1 business agent had informed him that there was a risk that the plumbing contract at the Hampton Court Project would go to a non-union contractor if relief from the A

4843-6207-8466.1

-11-

Agreement was not given to Signatory Contractors; on information and belief, the Local

1 business agent in question denied making that statement to Cahill and, on information

and belief, the entire project was built by union contractors, none of whom gave "relief"

from their usual agreements (other than the plumbing contractor) to the project's

developer.

      30.    At that meeting, the Association requested that the UA adopt

procedures that ensured that when a Site Specific schedule was made available for a

particular project, that it be made available before a contract for the plumbing work is

awarded, that its "relief" be specifically described and, most importantly, that all

Signatory Contractors be informed of its availability.

      31.    Subsequent to the meeting, the Association sent to the UA and

Cahill the draft of a form to be used for future Site Specific agreements, with a suggested

procedure to be followed by the UA to ensure that all Signatory Contractors were

informed of the availability of Site Specific relief before the plumbing contract was

awarded.  Until sometime in 2007, the suggested form and suggested procedures were

not adopted by the UA or used by Cahill.

      32.    In or about the spring of 2006, Signatory Contractors learned that

L&M Equities, a New York City developer, had retained Kreisler, Borg, Florman Inc.

("KBF"), a New York City construction manager, to build a 29 story residential structure

at 164 Kent Avenue, in the Williamsburg section of Brooklyn, New York ("Kent Avenue

Project").  Since KBF is a union construction manager which normally employs union

specialty contractors, such as plumbing contractors, many Association members,

4843-6207-8466.1

-12-

including some of the plaintiffs, planned to submit bids for the plumbing work based on the A Agreement.

33.    On information and belief, Cahill had discussions with officials of Local 1 in 2004 at the behest of ASA about whether ASA should be given advantageous terms under a Site Specific agreement for the Kent Avenue Project; Local 1 opposed a Site Specific agreement for that project and no approval for a Site Specific agreement was granted at that time because of Local 1's opposition.

34.    On information and belief, prior to September 1, 2006, ASA submitted a bid for the plumbing work to KBF based on the terms and conditions that ASA had requested through Cahill in 2004, but which had not been approved.

35.    Prior to September 1, 2006, several plumbing contractors submitted bids to KBF based on the A Agreement terms and conditions; they eventually learned that another contractor had been awarded the work.  Some or all of the plaintiffs would have submitted different bids had they known advantageous conditions were available for the plumbing contract at the Kent Avenue Project.

36.    On September 1, 2006, ASA applied for and received from New York City's Department of Buildings ("DOB"), a permit authorizing it to perform all the plumbing work in the entire 29 story structure.

37.    On September 15, 2006, Cahill wrote a letter to George Reilly ("Reilly"), Business Manager of Local 1, informing him that Local 1 contractors submitting bids on the Kent Avenue Project could calculate their bids based on a workforce consisting of one A Journeymen, one MES Journeyman and three MES

4843-6207-8466.1

-13-

Helpers.  On information and belief, KBF had already given the plumbing work to ASA prior to September 1, 2006.  On information and belief, Johnston and Cahill conceded that Johnston had started underground piping work at the Kent Avenue Project prior to September 15, 2006, but Cahill and Johnston insisted, although ASA had applied for and received a permit to perform all the plumbing work in the entire structure, that KBF had not given all the plumbing work to ASA prior to September 15, 2006.

38.    Upon information and belief, Cahill gave Johnston advantageous terms under the Site Specific agreement on several other jobs on which Johnston, through one of his plumbing contracting companies, was the plumbing contractor.

39.    In early November 2006, on information and belief, a business agent representing Local 1 visited a construction site at 40 West 116th Street, in the borough of Manhattan in New York City ("W.116 St. Project").  He discovered, on information and belief, that the plumbing work at the site was being performed by ASA, and that at least four plumbers working on the site were not members of Local 1, although ASA was then bound by the A Agreement and the MES Agreement with Local 1, which require that all plumbers employed by ASA become members of Local 1 within seven days and 30 days of their employment respectively.

40.    On information and belief, the Local 1 business agent spoke on the telephone with Johnston and inquired why the four plumbers in question had not applied for membership with Local 1; on information and belief, Johnston responded that Cahill had informed him that ASA could employ plumbers on a six month "trial basis" before they had to join Local 1.

4843-6207-8466.1

-14-

41.    Neither the Association, nor its members, nor, on information and belief, other Signatory Contractors, including plaintiffs, had been informed by Cahill or the UA that the W.116 St. Project could be bid under the UA Residential Agreement; nor were they informed in relation to the W.116 St. Project, or in relation to any other project, that they could "try out" plumbers for six months before requiring them to join Local 1.

42.    Article 5, Section 2 of the current MES Agreement states "[t]he Employer shall not be required to pay any contributions for Fringe Benefits for Helpers during their first six (6) months as members of this Union."  In order for a contactor to be relieved of its obligation to pay fringe benefits under this provision however, the employee must be a registered Local 1 Helper and must be within the first six (6) months of his or her membership.  Upon information and belief, the four plumbers in question were not Local 1 Helpers and were not within the first six (6) months of membership with Local 1; Johnston, therefore, was not relieved of his obligation to pay fringe benefits on behalf of the four plumbers.

## ANTICOMPETITIVE CONDUCT

43.    Upon information and belief, ASA, Riverdale and Johnston entered into a combination and conspiracy with defendant UA through defendant Cahill to unreasonably restrain trade and commerce, wherein Johnston, ASA and Riverdale took advantage of their special relationship with Cahill and he allowed them to bid for and obtain at least three plumbing contracts on the basis of journeymen-apprentice ratios and journeymen-helper ratios that are not authorized in writing in any CBA; that were

4843-6207-8466.1

-15-

not made available to other Signatory Contractors, including plaintiffs; that were not revealed to Local 1 or to other UA officials; and that were not disclosed to the Association.

44.    Upon information and belief, Johnston and ASA were able to submit bids on the Hampton Court Project, the Kent Avenue Project and the W.116 St. Project in reliance on a secret agreement with defendant UA through defendant Cahill that allowed ASA to underbid other Union plumbing contractors, including plaintiffs, who were in direct competition with it.

### EFFECTS OF DEFENDANT'S MISCONDUCT

45.    The interstate commerce involved in this case is the sale and purchase of large volumes of plumbing fixtures manufactured outside New York and transported to New York by rail and common carriers over interstate rail and road networks; on information and belief, these fixtures were and are used by ASA and Riverdale on the three projects cited above.

46.    The profits made by Johnston and ASA on the Hampton Court Project and the profits that will be earned on the Kent Avenue Project and the W.116 St. Project due to the combination and conspiracy with the UA through Cahill, constitute an unfair restraint on trade in that it allows Johnston, ASA and Riverdale to underbid his and its competitors on future projects, even if Cahill does not agree to let him or them use a Site Specific agreement on future projects.

47.    There is no legitimate business reason that justifies a union providing special terms and conditions to certain contractors while excluding others.

4843-6207-8466.1

**PRODUCT MARKET AND GEOGRAPHICAL MARKET**

48.    The product market in which this anticompetitive activity is taking

place is the market for the installation of plumbing systems and fixtures in newly

constructed residential buildings.

49.    The geographical market in which this anticompetitive activity is

taking place is the five counties of New York City.

**EFFECT ON COLLECTIVE BARGAINING**

50.    The impact on the legitimate collective bargaining activities of the

UA or Local 1 that will result from affording the plaintiffs the relief they seek will be

minimal, since Local 1 and the UA have no legitimate interest in affording selected

contractors advantageous collective bargaining terms at the expense of their

competitors; and if the relief sought is awarded, the only effect will be to ensure that all

Signatory Contractors , including plaintiffs, are afforded the opportunity to bid for

future jobs under the terms and conditions negotiated by the UA that in the past have

been reserved for ASA.

**AS AND FOR A FIRST CAUSE OF ACTION**

**Conspiracy to Restrain Trade in Violation of the Sherman Act, Section 1**

51.    Plaintiffs reallege and incorporate by reference the averments set

forth in Paragraphs 1 through 51 above.

52.    Beginning in or about 2003 and continuing to the present,

defendants engaged in a continuing combination and conspiracy with others to

unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act, 15

U.S.C. § 1. The unlawful combination and conspiracy continues up to the date of this Complaint.

53.     The combination and conspiracy in violation of § 1 of the Sherman Act consists of a continuing agreement among the defendants and others to establish a system wherein one favored contractor is allowed to depart from terms and conditions of employment mandated in a written CBA *via* a secret, oral agreement and is thereby empowered to underbid his and their competitors, including plaintiffs, in seeking plumbing work on residential projects in New York City.

54.     For the purpose of forming and effectuating the aforesaid combination and conspiracy, Johnston, ASA and defendant UA (through defendant Cahill) combined and conspired to agree on certain ratios of journeymen, apprentices and helpers that ASA would be permitted to use on certain projects and that would significantly reduce its overall labor costs and permit it to underbid its competitors; defendants also combined and conspired with the aforementioned to keep their private arrangement concealed from other Signatory Contractors, from Local 1, from the Association and its members, including plaintiffs, and from other UA officials.

55.     The conduct of defendants constitutes a *per se* violation of §1 of the Sherman Act. Alternatively, their conduct constitutes an unreasonable restraint of trade when measured against the "rule of reason."

56.     As a result of defendants' conduct as set forth above, plaintiffs and other contractor-members of the Association have been injured in their business. They suffered and continue to suffer, economic injury as a result of defendants' improper use

4843-6207-8466.1

-18-

of anticompetitive bidding schemes on certain residential construction projects in New York City.

## AS AND FOR A SECOND CAUSE OF ACTION

## Restraint of Trade in Violation of the Donnelly Act

57.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 through 51 above.

58.    Beginning in 2003 and continuing through the present, defendants engaged in a contract, agreement, arrangement, and combination with others in unreasonable restraint of trade and commerce in violation of the Donnelly Act, §§ 340 et seq. of New York General Business Law.

59.    This contract, combination, agreement, and arrangement consisted of, among other things, a secret oral agreement between defendant UA (through defendant Cahill) and ASA, and between Cahill and Johnston, that allowed one plumbing contractor to have the advantage of lower labor costs and to underbid competitors seeking to perform plumbing work on residential projects in New York City.

60.    As a result of this conspiracy, ASA and Johnston were able to underbid competing contractors in a highly competitive market, and thus deprived the competing contractors of earnings that they could have realized if they had been able to bid on the same basis as ASA.

61.    In addition, and as a further result of this conspiracy, owners, developers and construction managers ("CM's") were improperly persuaded to employ ASA as their plumbing contractor exclusively because of a low bid made possible by the

4843-6207-8466.1

conspiracy between Cahill and ASA/Johnston; the CM's, as a result, were denied access to other qualified plumbing contractors.

      62.     Defendants' acts are a *per se* violation of the Donnelly Act. Alternatively, defendants' acts violate the Donnelly Act under the rule of reason.

      **WHEREFORE**, plaintiffs demand judgment against defendants as follows:

      63.     for compensatory damages in an amount to be proven at trial;

      64.     for an order trebling the amount of compensatory damages to be awarded pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

      65.     for an award to plaintiffs of their attorneys' fees and costs of suit as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15;

      66.     for an award of pre-judgment and post-judgment interest on the above sums, to the extent permitted by applicable law and at the highest rate allowed by law;

      67.     for an order preliminarily and permanently enjoining and prohibiting defendants, their affiliates, assignees, subsidiaries and transferees, their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on behalf or in concert with them, from engaging in any conduct, conspiracy, contract, agreement, arrangement or combination, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

      68.     for an award of punitive damages; and

69.    for such other relief as the Court may deem just and equitable.

Dated: New York, New York
        July 25, 2008

                            KAUFF McCLAIN & McGUIRE LLP


                            By: _____
                                 Raymond G. McGuire
                                 950 Third Avenue, 14th Floor
                                 New York, New York  10022-2075
                                 (212) 644-1010
                                 *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on July 25, 2008, he caused a copy of the foregoing **AMENDED COMPLAINT** to be served by FedEx upon the following attorney:

James O'Connell, Esq.
O'Donoghue & O'Donoghue LLP
4748 Wisconsin Avenue, NW
Washington, D.C. 20016
*Attorney for the Defendants*


_____
Raymond G. McGuire

4833-2418-4834.1