## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
                                                    )
ASPRO MECHANICAL CONTRACTING, INC.,  )
BLUEPRINT PLUMBING LLC, CARDOZA      )
CORP., CRESCENT CONTRACTING CORP.,   )
GENERAL PLUMBING CORP., LOUIS L.     )        Index No. 08-cv-05612 (DAB)
BUTTERMARK & SONS, INC., PACE        )
PLUMBING CORP., PAR PLUMBING CO., INC., )
PARAMOUNT PLUMBING COMPANY OF        )
N.Y., INC., PARKVIEW PLUMBING &      )
HEATING INC., RIEHM PLUMBING CORP.,  )
TAGGART ASSOCIATES CORP. and V.C.    )
VITANZA SONS, INC.,                  )        **NOTICE OF MOTION TO**
                                     )        **DISMISS**
                         Plaintiffs, )
                                     )
            -against-                )
                                     )
UNITED ASSOCIATION OF JOURNEYMEN     )
AND APPRENTICES OF THE PLUMBING AND  )
PIPE FITTING INDUSTRY OF THE UNITED  )
STATES AND CANADA and JAMES CAHILL, in )
His official capacity as an International )
Representative of the UNITED ASSOCIATION )
OF JOURNEYMEN AND APPRENTICES OF     )
THE PLUMBING AND PIPE FITTING        )
INDUSTRY OF THE UNITED STATES AND    )
CANADA, and in his individual capacity, )
                                     )
                         Defendants. )
_____ )

      PLEASE TAKE NOTICE that upon the annexed Memorandum of Law in Support of

Defendants' Motion to Dismiss, the undersigned will move this Court before the Honorable

Deborah A. Batts, at the United States Courthouse, 500 Pearl Street, New York, New York,

10007, on a date set by the Court, for an Order dismissing the above captioned action pursuant to

Fed. R. Civ. P. 12(b)(6).

PLEASE TAKE FURTHER NOTICE that answering papers, if any, are to be served on or before September 12, 2008 and that reply papers, if any, are to be served on or before September 19, 2008.

Dated: August 28, 2008                              Respectfully submitted,


By:      /s/ Bruce Simon
        Bruce Simon (BS 2597)
        Oriana Vigliotti (OV 6784)
        **COHEN WEISS & SIMON LLP**
        330 West 42nd Street
        New York, NY  10036
        (212) 563-4100
        Fax: (212) 695-5436
        bsimon@cwsny.com
        ovigliotti@cwsny.com


        Brian A. Powers (*pro hac vice* to be filed)
        Jennifer R. Simon (*pro hac vice* to be filed)
        **O'DONOGHUE & O'DONOGHUE**
        4748 Wisconsin Avenue, N.W.
        Washington, DC  20016
        (202) 362-0041
        Fax:  (202) 237-1200
        bpowers@odonoghuelaw.com
        jsimon@odonoghuelaw.com

        *Attorneys for Defendants*

178386_1

2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| ASPRO MECHANICAL CONTRACTING, INC., BLUEPRINT PLUMBING LLC, CARDOZA CORP., CRESCENT CONTRACTING CORP., GENERAL PLUMBING CORP., LOUIS L. BUTTERMARK & SONS, INC., PACE PLUMBING CORP., PAR PLUMBING CO., INC., PARAMOUNT PLUMBING COMPANY OF N.Y., INC., PARKVIEW PLUMBING & HEATING INC., RIEHM PLUMBING CORP., TAGGART ASSOCIATES CORP. and V.C. VITANZA SONS, INC., ) ) ) ) ) ) ) ) ) ) ) ) ) | Index No. 08-cv-05612 (DAB)  **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

Plaintiffs,    )

-against-    )

)

UNITED ASSOCIATION OF JOURNEYMEN    )
AND APPRENTICES OF THE PLUMBING AND )
PIPE FITTING INDUSTRY OF THE UNITED    )
STATES AND CANADA and JAMES CAHILL, in)
His official capacity as an International    )
Representative of the UNITED ASSOCIATION    )
OF JOURNEYMEN AND APPRENTICES OF    )
THE PLUMBING AND PIPE FITTING    )
INDUSTRY OF THE UNITED STATES AND    )
CANADA, and in his individual capacity,    )

)

Defendants.    )

_____ )

Respectfully submitted,

Bruce Simon (BS 2597)
Oriana Vigliotti (OV 6784)
**COHEN WEISS & SIMON LLP**
330 West 42nd Street
New York, NY  10036
(212) 563-4100
Fax: (212) 695-5436
E-mail: bsimon@cwsny.com
        ovigliotti@cwsny.com

Brian A. Powers (*pro hac vice* to be filed)
Jennifer R. Simon (*pro hac vice* to be filed)
**O'DONOGHUE & O'DONOGHUE LLP**
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
(202) 362-0041
Fax:  (202) 237-1200
E-mail: bpowers@odonoghuelaw.com
        jsimon@odonoghuelaw.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................... ii

I.     INTRODUCTION ....................................................................................1

II.    ALLEGATIONS OF THE AMENDED COMPLAINT ............................................2

III.   LEGAL ARGUMENT ..............................................................................5

       A.    The UA's Job Targeting Program Is Exempted from Antitrust
             Scrutiny by the Non Statutory Labor Exemption ............................................5

       B.    Traditional Antitrust Analysis Also Requires the Dismissal
             of the Complaint ........................................................................................14

             1.    Pleading Requirements ...................................................................15

             2.    Plaintiffs Have Failed to Show Antitrust Injury ...............................16

             3.    Plaintiffs Have Failed to Allege a Plausible Conspiracy
                   to Impermissibly Restrain Trade ......................................................18

       C.    Plaintiffs' Claim Regarding the Hampton Court Project Is Time Barred......22

       D.    James Cahill Cannot Be Held Individually Liable .......................................22

       E.    Plaintiffs' Donnelly Act Claims Must be Dismissed ...................................24

IV.    CONCLUSION ...................................................................................25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Amalgamated Meat Cutters v. Jewel Tea Co.*,
 381 U.S. 657 (1965)............................................................................................8, 13

*American Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural,*
 *Ornamental and Reinforcing Iron Workers*,
 Case. No. 07-1832, 2008 U.S. Dist. LEXIS 16321 (1st Cir. August 1, 2008) .................23

*Apex Hosiery Co. v. Leader*,
 310 U.S. 469 (1940)..................................................................................................14

*Associated Gen'l Contractors v. Carpenters*,
 459 U.S. 519 (1983)..................................................................................................18

*Bell Atlantic Corp. v. Twombly*,
 127 S. Ct. 1955 (2007)...............................................................................................15

*Brown Shoe v. United States*,
 370 U.S. 294 (1962)..................................................................................................16

*Brown v. NFL*,
 518 U.S. 231 (1996)..................................................................................................19

*Brunswick Corporation v. Pueblo Bowl-O-Matic*,
 429 U.S. 477 (1977)..................................................................................................16

*Capitol Imaging v. Mohawk Valley Med. Ass'n*,
 996 F.2d 537 (2d Cir. 1993).......................................................................................14

*Carnegie-Mellon University v. Cohill*,
 484 U.S. 434 (1988)..................................................................................................25

*Clarett v. Nat'l Football League*,
 369 F.2d 124 (2nd Cir. 2004).............................................................................7, 8, 13

*Commerce Tankers Corporation*,
 553 F.2d 793 .............................................................................................................15

*Complete Auto Transit, Inc. v. Reis*,
 451 U.S. 401 (1981)..................................................................................................23

*Conley v. Gibson*,
 355 U.S. 41 (1955)..............................................................................................15, 16

                                                                              Page(s)

*Continental Maritime of San Francisco, Inc., v. Pacific Coast Metal Trades
     District Council*,
     817 F.2d 1391 ...........................................................................................8, 9, 10, 13

*FMC v. Pacific Marine Assn.*,
     435 U.S. 40 (1978)...........................................................................................14

*First National Bank of Arizona v. Cities Service Co.*,
     391 U.S. 253 (1968)..........................................................................................14

*George Hauk v. Rolls Royce Motor Cars Inc*,
     148 F.3d 136 (2d Cir. 1998)...............................................................................14

*Gonzalez v. St. Margaret's House Housing Development Fund Corp.*,
     880 F.2d 1514 (2d Cir. 1989)..............................................................................25

*Great Atlantic & Pacific Tea Co. v. Town of East Hampton*,
     997 F. Supp. 350 (E.D.N.Y. 1998) .....................................................................24

*Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669*,
     Civ. No. H-94-3309, 1997 U.S. Dist. LEXIS 7897 (D. Md. June 1, 1997), *aff'd*
     133 F. 3d 914 (4th Cir. 1998) ..................................................................10, 11, 13, 20

*Home Box Office, Inc. v. Directors Guild of America, Inc.*,
     531 F. Supp. 578 (S.D.N.Y. 1982)........................................................................9

*Intercontinental Container Transp. Corp. v. N.Y. Shipping Ass'n*,
     426 F.2d 884 (2nd Cir. 1970)..............................................................................13

*Johnson v. Newburgh Enlarged School District*,
     239 F.3d 246 (2d Cir. 2001)...............................................................................15

*Local 210, Laborers' Int'l Union v. Labor Relations Div. Associated Gen. Contractors of
     Am.*,
     844 F.2d 69 (2nd Cir. 1988)..................................................................................8

*Local Union 257, IBEW*,
     121 F.3d 1180 (8th Cir. 1997) .............................................................................11

*Matsushita Electric Industrial Corp. v. Zenith Radio Corporation*,
     475 U.S. 574 (1986)......................................................................................14, 20

*In re Merrill Lynch Ltd. P'ships Litig.*,
     154 F.3d 56 (2d Cir. 1998).................................................................................25

iii

Page(s)

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984)...............................................................................................15

*Montplaisir v. Leighton*,
    857 F.2d 1 (1st Cir. 1989) ....................................................................................23

*Nat'l Society of Professional Engineers v. United States*,
    435 U.S. 679 (1978)...............................................................................................16

*People of the State of New York v. Gassman*,
    66 N.E.2d 705 (N.Y. 1946)....................................................................................24

*Petrochem Insulation, Inc. v. Northern California and Northern Nevada Pipe Trades Council*,
    1992 U.S. Dist. LEXIS 4564 (N.D. Cal. 1992), *aff'd,* 8 F.3d 29 (9th Cir 1993)
    (per curiam), *cert. denied,* 510 U.S. 1191 (1994) ...............................................17

*Phoenix Electric Co. v. Nat'l Electrical Contractors Ass'n.*,
    81 F.3d 858 (9th Cir. 1996) ..............................................................................9, 13

*Redding Int'l Inc. v. Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2007)...................................................................24

*Smitty Baker Coal Co., Inc. v. UMW*,
    620 F.2d 416 (4th Cir.) ......................................................................................7, 14

*Stolow v. Greg Manning Auctions, Inc.*,
    258 F. Supp. 2d 236 (S.D.N.Y. 2003)...................................................................22

*Tigard Electric, Inc. v. Nat'l Electrical Contractors Assoc.*,
    790 F. Supp. 1498 (D. Or. 1992) ....................................................................17, 18

*Top Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998)....................................................................................21

*Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150*,
    433 F.3d 1024 (7th Cir. 2006) ..............................................................................17

*U.S. Information Systems Inc. v. IBEW Local 3*,
    2007 U.S. Dist. LEXIS 56229 (S.D.N.Y. 2007)..............................................20, 21

*United States v. E.I. DuPont de Nemours*,
    351 U.S. 377 (1956)...............................................................................................21

iv

Page(s)

*United States v. Topco Associates*,
    405 U.S. 596 (1972)...........................................................................................17

*Waterman v. Transport Workers' Union Local 100*,
    8 F. Supp. 2d 363 (S.D.N.Y. 1998), *aff'd,* 176 F.3d 150 (2nd Cir. 1999) ........................23

## STATUTES

15 U.S.C. § 15b (2008) ...................................................................................................22

NY CLS Gen Bus § 340(5) (2008) ................................................................................22

v

## I.    __INTRODUCTION__

This case turns on the issue of whether a union violates antitrust laws for conduct relating to the administration of a multi-employer agreement with plumbing contractors including the Plaintiffs.    The National Residential Agreement ("NRA") allows the Defendant United Association ("UA") to grant concessions to one or more signatory contractors, a form of job targeting, to capture work that, in the estimation of the Union, is in danger of being awarded to a non-union contractor.    The Plaintiffs claim that a violation of the antitrust laws occurred when the Defendants granted concessions to one contractor for three jobs over a four year period without affording other signatory contractors an opportunity to bid jobs on the same concessionary basis.    The complaint is notable for what it does not allege.    There is no allegation that the NRA requires that the job targeting concessions be extended to all signatory contractors or that the Defendants violated the collective bargaining agreement (CBA) by granting concessions in the manner that has been alleged.    Without a claim that Defendants did anything other than comply with the parties' CBA, the Amended Complaint boils down to an assertion that the NRA itself violates the antitrust laws.    Such a claim fundamentally misapprehends the relationship between labor laws and antitrust laws.    It cannot stand.

This controversy is a classic labor dispute entailing actions taken pursuant to a bona fide CBA, which concern wage and working conditions, and by which Defendants sought to further legitimate labor concerns.    Therefore, the actions of the Defendants are immunized from antitrust purview by the non-statutory labor exemption to antitrust laws.

Even if the conduct alleged were not exempt from anti-trust scrutiny, the Amended Complaint must be dismissed because no cognizable antitrust injury has been alleged.    Plaintiffs also have failed to plead the substantive elements required to establish a claim under Section 1 or

2 of the Sherman Act or the Donnelly Act. Those portions of the Amended Complaint relating to conduct occurring in 2003 also must be dismissed because they are outside the applicable statute of limitations.  Finally, we shall show that the allegations of the complaint do not state a claim against Defendant International Representative ("IR") Cahill.

## II.    ALLEGATIONS OF THE AMENDED COMPLAINT[1]

Plumbing contractors who are members of the Association of Contracting Plumbers of New York City ("ACP") have filed this amended complaint alleging violations of Section 4 of the Clayton Act, the New York antitrust law known as the Donnelly Act, and Sections 1 and 2 of the Sherman Act.  The ACP is a multi-employer group representing approximately sixty plumbing contractors in New York City. (Amended Complaint (hereinafter "Am. Copt." ¶ 11.) The ACP negotiates collective bargaining agreements with Plumbers Local 1 ("Local 1"). (*Id.* ¶¶ 10,12-13.)  The ACP also negotiates labor agreements with the Defendant UA.  (*Id.* ¶ 24.)  The UA is an International Union composed of local unions in the plumbing industry. (*Id.* ¶¶ 5.)  The UA also represents plumbing employees and negotiates and administers labor agreements directly with individual employers and employer associations performing plumbing work.  (*Id.*) ACP negotiated a CBA with Local 1, effective July 1, 2004, known as the "A" Agreement.  This CBA covers all new plumbing work and set the terms and conditions for the plumbers employed on such projects. (*Id.* ¶ 12.)  The "A" Agreement contains a mechanism, the Target Committee, designed to allow signatory contractors the ability to competitively bid plumbing work against low wage, non-union contractors on otherwise non-union projects. (*Id.* ¶ 22.)  The Target Committee is composed of representatives of Local 1 and the ACP with the power to receive requests of signatory contractors for concessions on jobs. (*Id.* ¶¶ 22-23.)  The Target Committee

---

[1] This summary of the facts alleged in no way constitutes an admission by Defendants of any allegations contained in the Amended Complaint.

decides whether to grant some or all of the relief sought by permitting the use of more helpers and apprentices than normally allowed under the "A" Agreement. (*Id.*)  The Target Committee's decision is communicated to all contractors signatory to the "A" Agreement.  This process places all signatory contractors on the same competitive footing based on the published decision of the Target Committee. (*Id.*)   No violation of the "A" Agreement has been alleged.

The ACP is also signatory to a CBA with the UA, the NRA, which took effect October 4, 2004. (*Id.* ¶ 24.)  The NRA is designed to encourage signatory contractors to attempt to recover segments of the residential market lost to non-union plumbing contractors who pay lower wages than their competing union plumbing contractors. (*Id.*)  The NRA sets forth various schedules of wages that can be utilized as a matter of right without further approval from the UA.  The NRA also permits the UA to grant "Site Specific" relief. (*Id.* ¶ 25.)   Site Specific wage and fringe packages are "decided by the UA on a case by case basis" and are subject to the approval of IR Cahill.  (*Id.* ¶¶25,27.)

Plaintiffs allege that in the summer of 2003, the ACP learned that IR Cahill granted permission to ASA Associates of New York ("ASA") to perform plumbing work pursuant to a Site Specific extension at a project at East 102nd Street in Manhattan ("Hampton Project"). Plaintiffs did not know of the concessions granted to ASA on this project before the work was awarded.  Some or all of the plaintiffs allegedly would have submitted bids on the project had they known of the concessions granted by Cahill. (*Id.*¶ 28.)

ACP met with the UA to express its concern that Site Specific concessions were extended to ASA for the Hampton Project.  (*Id.* ¶ 29.) At this meeting, ACP requested that the UA adopt procedures to ensure that when a Site Specific schedule was made available for a particular project, it be publicized to other signatory contractors before the contract for plumbing work was

awarded.  ACP proposed that the Union adopt a form along with a suggested procedure to ensure that signatory contractors would be aware of future Site Specific concessions before the plumbing contract were awarded. (*Id.* ¶ 31.)  The UA did not adopt the suggested forms or procedures until sometime in 2007.  (*Id.*)

In 2004 Cahill, at the behest of ASA, discussed with Local 1 whether ASA should be granted Site Specific relief under the NRA for a 29 story residential building to be built at 164 Kent Avenue in Brooklyn ("Kent Project").  Local 1 opposed the granting of relief and Cahill did not approve a Site Specific extension at that time. (*Id.* ¶ 33.)  In the Spring of 2006, Plaintiffs learned that a construction manager which normally employs union specialty contractors had been retained to build the Kent Project.  Plaintiffs allege that based on this information, many of them submitted bids for work on the Project based on the Local 1 "A" Agreement. (*Id.* ¶ 32.)

"On information and belief", Plaintiffs claim that ASA submitted a bid prior to September 1, 2006 for plumbing work on the Kent Project based on the concessionary terms and conditions that ASA had requested from Cahill in 2004 but which had not been approved and published to NRA signatories until September 15, 2006. (*Id.* ¶ 34.)  On September 1, 2006, ASA was issued a City Building permit authorizing it to perform all the plumbing work on the Kent Project, and was awarded the job prior to applying for the permit.  (*Id.* ¶ 36.)  Plaintiffs would have submitted different bids on the Kent Project had they known that more advantageous terms had been available through a Site Specific concessionary package.  (*Id.* ¶ 35.)

In early November 2006, a Local 1 Business Agent visited a job located on 40 West 116th Street in Manhattan ("116 St. Project") and discovered that ASA was performing the work on this job with at least four plumbers who were not members of Local 1.  The Amended Complaint alleges this violated provisions in the Local 1 "A" Agreement (to which ASA was bound) which

require that all plumbers become members of Local 1 shortly after employment. (*Id.* ¶ 39.) Following this job visit, the Business Agent was told by ASA president Bill Johnston that Cahill said ASA could employ plumbers on a six month "trial basis" before they had to join Local 1. (*Id.* ¶40.) Cahill never informed ACP or signatory contractors that the 116 St. Project could be bid under the NRA or that signatory contractors could "try out" plumbers for six months before the employees were required to join the union. (*Id.* ¶ 41.)

On the basis of the allegations set forth above, the Plaintiffs claim that ASA entered into a combination and conspiracy with the Defendants.  In the alleged conspiracy, Cahill allowed ASA to bid for and obtain three plumbing contracts on the basis of  concessions not authorized in writing by any CBA and not made available or revealed to the Plaintiffs.   (*Id.* ¶¶ 43-44.) According to the Amended Complaint, these "secret" agreements by and between the Defendants and ASA allowed ASA to underbid other union plumbing contractors who were in direct competition with ASA. (*Id.* ¶ 44.)  Plaintiffs further allege that the profits made by ASA on the three projects will allow ASA to underbid its competitors on future projects, which allegedly constitutes an unfair restraint of trade. (*Id.* ¶ 46.)   Plaintiffs claim the market for plumbing systems in newly constructed residential buildings within  New York City has been impacted by this alleged anticompetitive activity. (*Id.* ¶¶ 48-49.)   To remedy these claimed violations of antitrust laws, Plaintiffs seek treble damages and injunctive relief.

## III.    LEGAL ARGUMENT

### A.    The UA's Job Targeting Program Is Exempted from Antitrust Scrutiny by the Non Statutory Labor Exemption

In their Amended Complaint, Plaintiffs claim that the UA and ASA engaged in a conspiracy which allowed ASA to avoid using the wage rates and skilled/no skilled worker ratios set forth in the NRA.  (Am. Cmpt. ¶¶ 53-54.)  According to Plaintiffs, the UA permitted ASA to

5

"depart from the terms and conditions of employment mandated in a written CBA *via* a secret, oral agreement", and to bid for plumbing work using these ratios without informing Plaintiffs prior to the bid.  (*Id.*)  Plaintiffs' conspiracy claim – that the UA and ASA have conspired to evade the collectively bargained obligations binding upon all signatories to the NRA - is irreconcilable with the facts set forth in their Amended Complaint.  Assuming that all facts alleged are true, Defendants have done no more than follow the terms of the NRA.

As set forth more fully in the facts section above, the Plaintiffs allege that since 2004 they have been signatory to the NRA, which "was designed to encourage [union contractors] to attempt to recover segments of the residential market they had lost, and that were then dominated by non-union contractors, which paid lower wages and provided fewer (or no) benefits than were provided by union plumbing contractors."  (Am. Cmpt. ¶ 24.)  Under the terms of the NRA, a signatory contractor may seek permission from the UA to submit bids for a particular job based on classification ratios or wage rates different from those set forth in the NRA.  (*Id.* ¶¶ 25, 27.) This option, known as a "Site Specific" schedule, "has no published wages, benefits or work rules and the UA and [signatory contractors] agreed that those wages, benefits and work rules would be decided *by the UA* on a case by case basis."  (*Id.* ¶ 25 (emphasis added).)  Nowhere in their Amended Complaint do Plaintiffs allege that Defendants had any obligation to inform, much less reach agreement with, any other signatory contractors before approving a request for a Site Specific schedule during the time period the alleged conspiracy occurred.  To the contrary, the Amended Complaint alleges that although Plaintiffs (through the ACP) *proposed* that the UA immediately inform all signatory contractors every time the Union approved a request for Site-Specific relief, the UA did not adopt the proposal until well past the end of the alleged conspiracy – "sometime in 2007".  (*Id.* ¶¶ 30-31.)

Plaintiffs then assert that ASA bid, and the UA approved, Site Specific extensions exactly as contemplated under the NRA.  The Amended Complaint alleges that between 2003 and 2006 ASA requested, and Cahill granted, Site Specific relief on three residential projects without publishing such relief to Plaintiffs.  (*Id.*  ¶¶ 28, 32-38, 41.)  However, *as set forth in Plaintiffs' own Amended Complaint, the UA had no obligation to make its decisions regarding Site Specific wages and conditions known to Plaintiffs – or anyone else – until "sometime in 2007."*  Plaintiffs plead no facts supporting any departure from the NRA, much less any 'secret agreement' to violate that CBA.  At most, Plaintiffs have pled that the Site Specific provisions themselves violate the antitrust laws.  As we will explain, these provisions of the parties' CBA are protected from scrutiny under the non-statutory labor exemption to the antitrust laws.  Accordingly, Plaintiffs' complaint must be dismissed.

The antitrust laws, which promote competition, and the labor laws, which permit elimination of competition over wages and working conditions, "would inescapably clash unless carefully harmonized."  *Smitty Baker Coal Co., Inc. v.* UMW, 620 F.2d 416, 423 (4th Cir.); *cert* denied, 449 U.S. 870 (1980), *citing Allen Bradley Co. v. Local 3, IBEW*, 325 U.S. 797, 806 (1945).  The courts have long recognized that "in order to accommodate the collective bargaining process, certain concerted activities among and between labor and employers must be held to be beyond the reach of the antitrust laws."  *Clarett v. Nat'l Football League,* 369 F.2d 124, 130 (2nd Cir. 2004) (internal citations omitted).  Courts have articulated two categories of labor exemptions to the antitrust laws: statutory and non-statutory exemptions.  The activities alleged in this case are protected under the non-statutory exemption from the antitrust laws.

The non-statutory exemption serves two purposes: first, "to prevent the courts from usurping the [National Labor Relations Board's] function of determining, in the area of industrial

conflict, what is or is not a reasonable practice," and second, "to allow meaningful collective bargaining to take place by protecting some restraints on competition imposed through the bargaining process from antitrust scrutiny." *Clarett,* 369 F.2d at 130-131 (*citing Brown v. Pro Football, Inc.,* 518 U.S. 261, 236-37) (internal quotations omitted).

To assessing whether the non-statutory exemption should apply, this Circuit follows the balancing test articulated by the Supreme Court in *Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 657 (1965). In that case, an employer challenged the provision of a multi-employer CBA which restricted the hours of operation at meat-counters for all signatory employers. Jewel signed the CBA, then challenged the hours restriction on antitrust grounds. The union argued that it sought the restriction to serve its own interests for its members, because no limitation on marketing hours "either would inaugurate longer hours and night work for the butchers or would result in butchers' work being done by others unskilled in the trade." *Id.*, 381 U.S. at 682. The Court weighed these interests of union members against the restriction's relative impact on the product market, and found that "the national labor policy protecting union agreements restricting wages, hours and working conditions overrides antitrust policy." *Continental Maritime of San Francisco, Inc., v. Pacific Coast Metal Trades District Council,* 817 F.2d 1391, 1393 (citing *Jewel Tea,* 381 U.S. at 689-90.) As Justice White explained, the hours restriction was

> so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arms'-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with non-labor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act.

*Jewel Tea* at 689-90. The Second Circuit has adopted this "classic formulation" of the non-statutory exemption. *See, e.g., Clarett,* 369 F.3d 124, 132 n.12; *Local 210, Laborers' Int'l Union v. Labor Relations Div. Associated Gen. Contractors of Am.,* 844 F.2d 69, 79 (2nd Cir. 1988).

Courts have consistently employed the non-statutory labor exemption to shield collectively bargained job targeting programs from antitrust scrutiny.  In *Phoenix Electric Co. v. Nat'l Electrical Contractors Ass'n.,* 81 F.3d 858 (9th Cir. 1996), non-signatory contractors filed suit against a union challenging a job-targeting program established through a multi-employer collective bargaining agreement.  Like the job-targeting program in the instant case, the program in *Phoenix* aimed to recapture market share for unionized contractors.  *Id.* at 859.  Also similar to the instant case, the union in *Phoenix* had complete discretion to determine whether to target the job and if so, what the specially-authorized, lower wage rate would be.  *Id.*

The District Court granted summary judgment to the union under the non-statutory exemption, and the Ninth Circuit affirmed. The Ninth Circuit's decision in *Phoenix* clearly encompasses Justice White's three-pronged analysis in *Jewel Tea:* (1) whether the challenged practice intimately relates to wages, hours and working conditions – mandatory subjects of bargaining at the heart of national labor law; (2) whether the practice at issue was the product of bona fide collective bargaining, again, an activity clearly protected by Congress through a variety of statutes including the Labor Management Relations Act;[2] and (3) whether the job-targeting program was created to further the union's goals as exclusive bargaining representative of employees – to place some restraints the labor market as encouraged by federal labor policy. The *Phoenix* court answered all three questions in the affirmative, and accordingly found the program protected by the non-statutory exemption*. Id.* at 858-863.

The Ninth Circuit also rejected an antitrust challenge to a job targeting program in *Continental Maritime*, 817 F.2d 1391 (9th Cir. 1987).  *Continental* is the case most factually similar to this one.  Plaintiff Continental, a San Francisco shipyard signatory to a multi-employer

---

[2] In the words of this Court, "[r]eaching such agreements, after all, is the primary objective of national labor policy." *Home Box Office, Inc. v. Directors Guild of America, Inc.,* 531 F.Supp. 578, 593 (S.D.N.Y. 1982)

CBA, sued the union for entering into special "project agreements" with two other signatory shipyards based in Portland, Oregon, in which the union agreed to lower the wages the Portland yards had to pay for certain work governed by the CBA.  The union did not offer Continental any similar wage concessions.  Continental sued, claiming the union and the other two contractors conspired to grant concessions to some signatory shipyards but not to others.  The Ninth Circuit, affirming the District Court, found the project agreements fell within the non-statutory labor exemption.  The reasoning of the *Continental* court mirrors the *Phoenix* court's: the project agreements were exempt because they concerned only wages, hours, and working conditions, they were the product of arm's length bargaining, and they were crafted to respond to significant non-union competition in Portland, resulting in high unemployment of union members there.

Significantly, the Ninth Circuit found the fact that the union granted wage concessions to only some of its signatory contractors did not indicate a conspiracy against the signatory contractors who did not receive similar concessions.  "While the parties may have hoped that all of this work [obtained through wage concessions] would come at the expense of non-union firms, they must have expected that some of it could come from other union firms like Continental.  There is no evidence, however, that the defendants were motivated by anything but the goal of helping the Portland firms."  *Id.* at 1394.  In other words, the non-statutory exemption grants unions broad discretion to reach a wide variety of agreements which will further their goals – even if those agreements seem to give some union contractors an advantage over others.

The Fourth Circuit has similarly used the non-statutory exemption to protect job-targeting programs from antitrust liability in *Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669,* Civ. No. H-94-3309, 1997 U.S. Dist. LEXIS 7897 (D. Md. June 1, 1997), *aff'd* 133 F. 3d 914 (4th Cir. 1998).  The facts in *Grinnell* are also remarkably similar to the case at bar.  Under

10

the collectively bargained job targeting program "at all times, the Union had the final say as to whether any concessionary rate would be granted for a particular reduction and as to the amount of the reduction." *Grinnell,* 1997 U.S. Dist. LEXIS at *22. And in *Grinnell,* like this case, the plaintiff claimed that the union and other, signatory employers entered into a conspiracy to deny Grinnell any 'discount' under the program. The district court found no antitrust conspiracy could exist, because under the CBA "Grinnell never had the right to such a discount. The Union always reserved to itself the right in its discretion to permit targeting by a particular contractor or to deny targeting by a particular class of contractors." *Id.* at *26. As a result, the court found that "evidence of a conspiracy or of an agreement to fix prices does not exist." *Id.* at *31. The court also held that the job targeting program itself was protected by the non-statutory exemption. "The [job targeting program] challenged by plaintiff concerned wages and other conditions of employment, and…its effects were felt principally in the labor market. The conduct in question was part of the union's bargaining strategy and was designed to advance the Union's interest." *Id.* at *36. As in *Phoenix* and *Continental*, the *Grinnell* court found that a collectively bargained job targeting program furthers the policy goals explicitly protected by the nation's labor laws far more than it infringes upon competition in the business arena.

Finally, the Eighth Circuit has similarly protected a collectively bargained job targeting program between a union and a multi-employer association from antitrust scrutiny in *Local Union 257, IBEW,* 121 F.3d 1180 (8th Cir. 1997). Indeed, Defendants have not encountered a single case where a job-targeting program has been deemed to violate the Sherman Act.

This case falls squarely within the abundant precedent dismissing antitrust claims in job targeting cases. Like *Jewel Tea* and its progeny, the challenged practice occurs under the auspices of a CBA. As Plaintiffs admit in their Amended Complaint, the UA, through the NRA,

11

negotiated the absolute right to grant Site Specific concessions on a case by case basis, and had no obligation to publish the granted concessions to other signatory contractors until 2007, well after the complained-of conduct occurred.  (Am. Cmpt. ¶¶ 25, 27, 30-31.)  As discussed above, *the Plaintiffs have pled no facts demonstrating or even suggesting that the UA did anything but exercise its contractual rights in granting ASA the Site Specific concessions it requested.*

As a collectively negotiated restriction on competition, the Site Specific provisions of the CBA clearly meet the three pronged analysis enunciated in *Jewel Tea*.  First, the Site Specific concessions directly impact terms and conditions of employment – they concern "wages, benefits and work rules" for employees covered by the CBA.  (*Id.* ¶ 25.)

Second, Plaintiffs have made no allegations to suggest that the site specific provisions were not the product of bona fide, arms' length bargaining.  Plaintiffs concede that when they signed the NRA in 2004, the Agreement permitted the UA to grant Site Specific concessions to the contractor who requested them, and imposed no other obligations upon the Union.  (*Id.* ¶ 25.)  Apparently Plaintiffs were unhappy with the UA's power in these circumstances, because at some point they "requested" that the UA change its practices under the NRA and "adopt procedures that insured that when a Site Specific schedule was made available for a particular project, that it be made available before a contract for the plumbing work is awarded, that its 'relief' be specifically described, and, most importantly, that all Signatory Contractors be informed of its availability."  (*Id.* ¶ 30.)   The Union did not accede to Plaintiffs' request until "sometime in 2007."  (*Id.* ¶ 31.)   The sequence of events illustrates classic arms-length bargaining.  Simply stated, the parties struck a deal in the 2004 NRA, one party to the agreement (the Employers) didn't like the amount of power the Union had negotiated to itself in granting site specific concessions, and ultimately they reached a compromise more to both sides'

satisfaction.   Not only does the Amended Complaint lack any allegations that the relevant provisions of the CBA subverted the collective bargaining process, the facts alleged clearly show that the Site Specific provisions are the product of a genuine bargaining relationship.

Finally, the site specific provisions easily satisfy the third prong of Justice White's analysis.  There can be no question that the UA negotiated the job targeting program in the NRA "in pursuit of their own labor union policies." *Jewel Tea*, 381 U.S. at 690.  Plaintiffs concede as much.  As they explain, the NRA "was designed to encourage [signatory contractors] to attempt to recover segments of the residential market they had lost, and that were then dominated by non-union plumbing contractors, which paid lower wages and provided fewer (or no) benefits than were provided by union plumbing contractors."  (Am. Cmpt. ¶ 24.)  The courts have held again and again that protecting members' jobs (in this case, by increasing their work opportunities) is a fundamental, and lawful, union concern.  *See, e.g., Clarett,* 369 F.3d at 140 ("the preservation of jobs is within the area of proper union concern, and union activity having as its object the preservation of jobs for union members is not violative of the anti-trust laws.") (citing *Intercontinental Container Transp. Corp. v. N.Y. Shipping Ass'n,*  426 F.2d 884, 887-88 (2nd Cir. 1970); *see also Continental Maritime,* 817 F.2d at 1394; *Phoenix Electric Co,*  81 F.3d at 863; *Grinnell,* 1997 U.S. Dist. LEXIS at *27-28.[3]

Plaintiffs' complaint alleges that the Site Specific concessions were awarded by the UA in conformance with the NRA.  These collectively bargained job targeting provisions are exempt from the purview of federal antitrust statutes as a matter of law.  Accordingly, the complaint must be dismissed.

---

[3] Balancing this fundamental union interest against the Site Specific schedule's "relative impact on the product market" further compels a finding that the non-statutory exemption applies here.  *Clarett,* 369 F.3d at 132 (*citing Jewel Tea,* 381 U.S. at 690, n.5.)  Plaintiffs allege that ASA had been improperly awarded *three jobs over a four year time period.*  The plumbing market in New York City has been negligibly impacted – if indeed it has been impacted at all -- by the operation of the Site Specific schedule as alleged in the Amended Complaint.

13

### B.     <u>Traditional Antitrust Analysis Also Requires the Dismissal of the Complaint</u>

A Plaintiff can not prevail in an antitrust lawsuit against a labor organization merely by showing that the conduct was not covered by the labor exemption.  There must be additional proof of the antitrust violation itself.  "Activities of labor organizations not immunized by the Clayton Act are not necessarily violations of the Sherman Act."  *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 512 (1940); *FMC v. Pacific Marine Assn*., 435 U.S. 40, 61 (1978).

A private person seeking to establish a claim under sections 1 and 2 of the Sherman Act as well as treble damages under the Clayton Act must as a threshold matter establish "antitrust injury."  *George Hauk v. Rolls Royce Motor Cars Inc,* 148 F.3d 136, 139 (2d Cir. 1998).  This requires "that the challenged action had an actual adverse effect on competition as a whole in the relevant market; to prove [plaintiff] had been harmed as an individual competitor will not suffice."  *Capitol Imaging v. Mohawk Valley Med. Ass'n,* 996 F.2d 537, 543 (2d Cir. 1993).  As set forth in *Smitty Baker,* "[t]o amount to an antitrust violation, the agreement must be rooted in an anti-competitive purpose, and must effect an anti-competitive result, as evidenced by action 'ruining' a competitor's business or driving him out of business.  Unless there is such an agreement between the labor organization and the non-labor group and such a competitive result, there is no conspiracy actionable under the anti-trust laws."  620 F.2d at 431-432.

If the conduct claimed makes no apparent economic sense for one or both of the alleged conspirators, this casts doubt on whether it is plausible to conclude that any unlawful conspiracy exists at all.  *See, Matsushita Electric Industrial Corp. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986); *First National Bank of Arizona v. Cities Service Co*., 391 U.S. 253 (1968).  Also, when the alleged conduct is consistent with permissible competition as well as with illegal

conspiracy, no inference of antitrust conspiracy is permissible. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984).

The Second Circuit has noted that "the Court intended that there be a full scale rule of reason inquiry in every instance in which a non-exempt activity is claimed to be in violation of antitrust." *Commerce Tankers Corporation,* 553 F. 2d 793, 802 n. 8 (*citing Jewel Tea.*)

### 1.    Pleading Requirements

In considering a motion to dismiss, a Court accepts as true the material facts alleged in the complaint and draw all reasonable inferences in Plaintiffs' favor. *Johnson v. Newburgh Enlarged School District*, 239 F.3d 246, 250 (2d Cir. 2001). However, in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) the Supreme Court recently reconsidered the proper pleading standard to be used in the context of a motion to dismiss in a suit alleging violations of the Sherman Act. *Id.,* at 1961. After *Twombly,* mere notice pleading is no longer deemed sufficient to survive a motion to dismiss, especially in a case alleging antitrust violations. The Court overruled any literal reading of *Conley v. Gibson*, 355 U.S. 41, 47 (1955), that had encouraged courts to refrain from granting a motion to dismiss unless "no set of facts" could conceivably support the claims of the complaint. *Id.* at 1069 (This "no set of facts" approach "has earned its retirement" and is "best forgotten.") The Court emphasized that a plaintiff's obligation to plead the "'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*, at 1965. There must be sufficient facts to raise a reasonable expectation that discovery will reveal an illegal agreement and the line "between the factually neutral and the factually suggestive…must be crossed to enter the realm of plausible liability." *Id.* at 1966. Under *Twombly,* a complaint must

15

be dismissed when "the plaintiffs have not nudged their claims across the line from conceivable to plausible."[4]  *Id.* at 1974.

## 2.    Plaintiffs Have Failed to Show Antitrust Injury

The Supreme Court has recognized that it is necessary for defendants to demonstrate that that they have suffered an antitrust injury.  *Nat'l Society of Professional Engineers v. United States*, 435 U.S. 679, 687 (1978).  A showing of mere injury is not enough. "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corporation v. Pueblo Bowl-O-Matic*, 429 U.S. 477, 489 (1977).  As discussed *supra* at page 14, antitrust injury is by definition quite severe: it must adversely affect competition as a whole throughout the relevant market and result in the 'ruin' of a competitor's business.

Antitrust laws were enacted "for the protection of **competition** not **competitors**."  *Brown Shoe v. United States*, 370 U.S. 294, 320 (1962) (emphasis in original).  In this case, Plaintiffs claim, at best, that they were injured because they would have bid on three projects if they had known that concessions were available.  There is no allegation that prices have risen or been impacted in any way in a geographic market, no allegation that the plumbing construction market has been impacted, and no claim that Plaintiffs have been ruined by the acts of the Defendants or have been driven out of business or excluded from any market.

Even if Plaintiffs have made such claims, which they have not, any claim of antitrust injury in this case would fail *Twombly*'s plausibility test.  The alleged conspiracy consists of a mere three jobs over a four year period.  One of those jobs, the Hampton Project, was performed

---

[4]  In *Twombly*, the Court noted that antitrust lawsuits frequently entail "sprawling, costly, and hugely time-consuming" discovery that is often difficult to manage.  *Id.* at 1967 n. 6.  Courts must closely scrutinize an antitrust complaint consistent with the plausibility standard of *Twombly* rather than needlessly plunge the parties and the court into the potentially enormous expense of discovery attendant to the litigation of antitrust claims.

in 2003, outside of the applicable statute of limitations and at a time when the Plaintiffs were not bound by the NRA. The Kent Project, performed in 2006, consists of a single 29 story apartment building. The final job, also performed in 2006 at 116th St., boils down to an allegation that IR Cahill told ASA that four plumbers did not have to join the Union immediately but could wait for a six month trial period. This hardly suggests any plausible impact on a construction market as large as New York City. *United States v. Topco Associates,* 405 U.S. 596, 606 (1972) (Congress did not intend to prohibit practices which "in some insignificant degree" restrain competition); *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150,* 433 F.3d 1024 (7th Cir. 2006) (Termination of one job may be a loss for plaintiff but it does not establish antitrust injury. Antitrust laws protect consumers from suppliers rather than suppliers from each other); *Petrochem Insulation, Inc. v. Northern California and Northern Nevada Pipe Trades Council,* 1992 U.S. Dist. Lexis 4564 (N.D. Cal. 1992), *aff'd,* 8 F.3d 29 (9th Cir 1993) (per curiam), *cert. denied,* 510 U.S. 1191 (1994) (allegation that Plaintiff could not submit bids to four out of 93 jobs identified in the complaint fails to demonstrate antitrust injury).

Here, as in *Tigard Electric, Inc. v. Nat'l Electrical Contractors Assoc.,* 790 F. Supp. 1498 (D. Or. 1992) a closely analogous case, the operation of the UA's concession program does not amount to an antitrust injury. The plaintiffs in *Tigard* consisted of non-union electrical contractors who claimed that a union job targeting program violated the antitrust laws because signatory contractors and the local union shared information concerning jobs believed to be under threat of non-union competition. The Court dismissed the complaint, not on the basis of the non-statutory exemption, but because the plaintiffs had failed to allege an antitrust injury. The Court noted that the non-union contractors were not denied the right to bid on targeted jobs. There was also no showing that they would not be awarded those jobs if their bids were low

17

enough.  The Court ruled that "[p]laintiffs are essentially complaining not that **competition** is being injured, but that they as **competitors**, are being injured because defendants' cooperation allows defendants to compete too successfully.  Allegations of lost income because of exclusion from a market are insufficient." (emphasis in original)  *Id.* at 1503.  This holding applies with stronger force to this case because the Plaintiffs here not only fail to allege antitrust injury, they are also not strangers to the collective bargaining agreement as could be claimed in the *Tigard* case.  Plaintiffs in the instant case were never excluded from any bidding on any jobs and for that matter they never even sought out Cahill to seek relief for any of the jobs in question.  All they claim is that if they had known of the concessions granted by Cahill, they would have bid the jobs on that basis.  That claim is patently insufficient to establish antitrust injury.

### 3.    Plaintiffs Have Failed to Allege a Plausible Conspiracy to Impermissibly Restrain Trade

As discussed throughout this brief, any analysis of this case must start with the premise that a labor union is a different type of player in the economic marketplace than a business enterprise.  "As a general matter, a union's primary goal is to enhance the earnings and improve the working conditions of the membership; that goal is not necessarily served, and indeed may be harmed, by uninhibited competition among employers striving to reduce costs in order to gain a competitive advantage over their rivals."  *Associated Gen'l Contractors v. Carpenters,* 459 U.S. 519, 539 (1983).  A union may, on occasion, have a motive to disadvantage non-union contractors whose prosperity often comes at the expense of their member's jobs, but no similar motive is readily discernable for unions to disadvantage its signatory contractors.  Here, the allegations of the Amended Complaint involve concessions allegedly given to one but not made known to other members of the same bargaining unit.  It simply makes no economic sense and it

is entirely implausible to infer that the union was acting with any predatory intent to ruin union signatory contractors.

A union's desire to maximize wages sometimes creates a tension with the need to expand job opportunities for members. This case involves a union's strategic decisions, as permitted by its CBA, to attempt to make a signatory contractor more competitive to meet the threat of non-union competition. Plaintiffs allege that the ACP and the Plaintiffs were aware of the manner in which the NRA was administered in the summer of 2003 and met with the UA to register their objections. Despite these reservations the ACP signed the NRA the following year while continuing to press for their preferred method for concessions to be granted in a transparent manner as was the case under the Local 1 contract. The persistence of the ACP paid off in 2007 when the UA adopted the proposed modifications suggested by the ACP.

To infer from the facts pled in the Amended Complaint that the UA was acting with predatory intent when it extended concessions to one but not all of the signatory contractors is implausible. The UA was indisputably acting in accordance with its rights under the contract. As stated by the Supreme Court in *Brown v. NFL*, 518 U. S. 231, 242 (1996), "The labor laws give the [NLRB], not antitrust courts, primary responsibility of policing the collective bargaining process. And one of the objectives was to take from the antitrust courts the authority to determine, through application of the antitrust laws, what is socially or economically desirable collective bargaining policy." It is not for courts to determine whether the UA approach to concessions was flawed, unwise, ineffective, or unfair. Nor are the antitrust laws to be used to take sides concerning whether the Local 1 Job Targeting approach was preferable to the UA's approach under the NRA. It is enough that the UA had the unfettered contractual right to administer the concessionary Site Specific program without publishing the concessions to other

contractors.  No antitrust conspiracy can be inferred from a union acting within its contractual rights to extend concessions to one but not to all.

The existence of plausible neutral explanations for the union's conduct also strongly argue against finding any conspiracy violative of the antitrust laws.  *Matsushita,* 475 U.S. at 588. The UA may well have believed that it needed the flexibility to extend concessions on a case by case basis because of the need to respond quickly to the give and take of the bidding process. The UA may have also believed that it was advantageous  to foster contractors who were willing to bid in markets left fallow by more satisfied contractors and to reward contractors that had invested resources in developing relationships in markets that other union contractors had been reticent to enter. The facts of this case do not differ markedly from *Grinnell, supra*.  In that case, the union, another affiliate of the UA, negotiated a job targeting program wherein the union reserved the right to determine in its discretion whether a concessionary wage or other rate would be granted for a particular job, the amount of the reduction and which contractor or contractors would be granted the concession.   The Court rejected the antitrust claims of a signatory contractor denied access to the targeting program:  "The Union had always reserved to itself the discretion to permit targeting by a particular contractor or to deny targeting to a particular class of contractors."  *Grinnell,* 1977 U.S. Dist. Lexis at 26-27.  The same result should occur in the instant case.  Plaintiffs have failed to allege facts establishing a plausible conspiracy on the part of Defendants.

The Sherman Act requires combinations between two or more parties who act in concert to violate the antitrust laws.  To survive a motion to dismiss, plaintiffs must properly plead facts that "tend[] to exclude the possibility that the alleged conspirators acted independently." *Matsushtita*, 475 U.S. at 588.  In *U.S. Information Systems Inc. v. IBEW Local 3*, 2007 U.S. Dist.

Lexis 56229 (S.D.N.Y. 2007), this Court considered an antitrust claim that IBEW Local 3 and certain contractors had entered into an antitrust conspiracy to harass other contractors, owners and tenants to exclude firms that utilized workers represented by a rival union.  In dismissing the antitrust complaint, the court found that it was just as plausible that the contractor defendants "acted in their own self interest independent of Local 3 and one another." *Id.* at \*48.  Once the contractor defendants were removed from the equation, no conspiracy allegation could stand.  The court held that "unilateral conduct [by Local 3] is outside the scope of § 1 of the Sherman Act…  Local 3's actions cannot constitute an antitrust violation under § 1 unless the union acted in concert with others." *Id.* at \*49.

The holding in *U.S.  Information Systems* applies with equal force to this case.  Plaintiffs allege that the UA operated a concession program pursuant to the NRA that requires contractors who wish to avail themselves of relief to obtain the consent of IR Cahill.  The alleged antitrust harm does not flow from the granting of concessions but rather from the alleged failure of Cahill to publish those concessions to other signatory contractors.  The Amended Complaint completely fails to allege that there was an agreement on the part of the UA and ASA that the concessions received by ASA would not be published or extended to other contractors.  Absent such an allegation, the conclusion is inescapable that ASA sought, on the basis of its own self interest, to obtain concessions on certain jobs and that the Defendants acted independently and unilaterally to not publish those concessions to others.  The complaint must be dismissed for failure to allege the existence of a conspiracy in violation of Section 1 of the Sherman Act.[5]

---

[5] Plaintiffs also allege, without any specificity, a violation of Section 2 of the Sherman Act.  Section 2 claims rise and fall on proof that the Defendants possess monopoly power in the relevant market, *United States v. E.I. DuPont de Nemours,* 351 U.S. 377, 391 (1956), or, in the case of attempted monopolization, a showing that there is a dangerous probability of achieving monopoly power.  *Top Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 99-100 (2d Cir. 1998).  The Amended Complaint falls far short of alleging that the UA or ASA possess monopoly

C.    **Plaintiffs' Claim Regarding the Hampton Court Project Is Time Barred**

Both federal and New York State antitrust actions are governed by a four-year statute of limitations.  15 U.S.C. § 15b (2008); NY CLS Gen Bus § 340(5) (2008).  Where, as here, Plaintiffs allege a continuing conspiracy, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and...as to those damages, the statute of limitations runs from the commission of that act.  *However, the commission of 'a separate and new overt act' will not permit the plaintiff to recover for the injury caused by the old overt acts that do not fall within the limitations period.*"  *Stolow v. Greg Manning Auctions, Inc.,* 258 F. Supp. 2d 236, 251 (S.D.N.Y. 2003) (emphasis added).

Plaintiffs' Sherman Act and Donnelly Act claims regarding the Hampton Project must be dismissed because they were not brought within the four-year statute of limitations period.  Plaintiffs learned that the UA had permitted ASA to bid Hampton Court Project under a NRA Site Specific basis "in or about the summer of 2003", at a time when ASA had already been awarded the plumbing work at the site.  (Am. Cmpt. ¶ 28.)  Plaintiffs further allege that because they did not know Site Specific bidding was available they lost the opportunity to bid on the Project, thus suffering business injury.  (*Id.*)  The latest possible date Plaintiffs could have suffered a business injury is the summer 2003, when the bids had already been submitted and the contract had already been awarded.  As a result, the statute of limitations for the claims regarding the Hampton project had run by Summer 2007, a year before the Complaint was on June 20, 2008.  Accordingly, Plaintiffs' claims are time-barred.

---

power in the New York City residential plumbing market.  The opposite is true.  The clear inference from the Amended Complaint is that union contractors were without economic power in the residential market.

### D.    James Cahill Cannot Be Held Individually Liable

Plaintiffs have named James Cahill, an International Representative for the UA, as an individual defendant.  (Am. Cmpt. ¶ 6.)  Plaintiffs allege that Cahill had the sole authority and discretion to grant Site Specific concessions under the NRA.  (*Id.* ¶¶ 26-27.)  They allege that he granted such concessions to ASA on the Hampton Project, the Kent Project, and the 116 Street Project without first informing the Plaintiffs.  (*Id.* ¶¶ 28, 34, 37-38, 41.)  Plaintiffs allege that these actions are an unlawful attempt to restrain trade and that Cahill, acting within the scope of his agency and authority as a UA representative, violated the state and federal antitrust laws. (*Id.* ¶¶ 43-44, 46, 51-62.)   None of these claims against Cahill may go forward, since union representatives are immune from suit stemming from their acts performed on the union's behalf.

The Supreme Court has long held that union representatives are not individually liable to third parties for "acts performed on the union's behalf in the collective bargaining process." *Montplaisir v. Leighton,* 857 F.2d 1, 4 (1st Cir. 1989) *citing Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 247-49 (1962).  This rule applies regardless of whether the union authorized the representative's conduct.  *Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, n. 5, 417 (1981) (*citing* Section 301 of the Labor Management Relations Act: "Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.")

Since *Reis,* the courts have consistently endorsed the principle that individual union members and agents are immune from suit.  *See, e.g., American Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental and Reinforcing Iron Workers,* Case. No. 07-1832, 2008 U.S. Dist. LEXIS 16321, *2-3, n.3 (1st Cir. August 1, 2008) (noting district

23

court's dismissal of union representative from suit alleging antitrust violations); *Waterman v. Transport Workers' Union Local 100,* 8 F. Supp. 2d 363, 370 (S.D.N.Y. 1998) (collecting cases), *aff'd,* 176 F.3d 150 (2nd Cir. 1999).

Plaintiffs' claims against Cahill rise and fall on the lawfulness of his granting Site Specific concessions to ASA.  In so doing, Cahill indisputably acted as a representative of the UA in the administration and enforcement of the collective bargaining agreements between the parties. Union members and officials may not be held individually liable when acting in such a capacity.  Accordingly, Cahill must be dismissed from the Complaint as a matter of law.

### E.    Plaintiffs' Donnelly Act Claims Must be Dismissed

For all of the reasons explained *supra*, the federal antitrust claims must be dismissed, leaving only the Plaintiffs' state law claim under New York Law, known as the Donnelly Act. The Donnelly Act is the state antitrust law; it "is patterned after the Sherman Anti-Trust Act…and is generally construed in light of federal precedent." *Great Atlantic & Pacific Tea Co. v. Town of East Hampton,* 997 F. Supp. 350, 352 (E.D.N.Y. 1998).  Like the federal anti-trust laws, the Donnelly Act recognizes the labor exemptions. *See People of the State of New York v. Gassman,* 66 N.E.2d 705, 707 (N.Y. 1946).  Moreover, "under New York law, the state and federal antitrust statutes require identical basic elements of proof." *Redding Int'l Inc. v. Oaktree Capital Mgmt. LLC,* 317 F. Supp. 2d 301, 332 (S.D.N.Y. 2007).  Accordingly, the state anti-trust claims must be dismissed on identical grounds as the Sherman Act claims – the claims are immunized from anti-trust scrutiny by the non-statutory labor exemption, and, even if non-exempt, the claims do not state a violation of the anti-trust laws.

In addition, the Donnelly Act claims must be dismissed under the doctrine of pendent-claim jurisdiction.  As the Second Circuit has held, "in the usual case in which all federal law

claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness and comity – will point toward declining jurisdiction over the remaining state law claims." *In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 61 (2d Cir. 1998) (quoting *Carnegie-Mellon University v. Cohill,* 484 U.S. 434, 350 n.7 (1988)); *see also Gonzalez v. St. Margaret's House Housing Development Fund Corp.,* 880 F.2d 1514, 1520 (2d Cir. 1989)(if federal antitrust claims dismissed, court has discretion to decline jurisdiction over Donnelly Act claim). Thus, the Court should decline to exercise jurisdiction over Plaintiffs' state law claims on this additional basis.

## IV.    CONCLUSION

For the foregoing reasons, Defendants United Association and James Cahill respectfully requests that this motion be granted and that all claims against them be dismissed.

Dated:  August 28, 2008                              Respectfully Submitted,


By:    /s/ Bruce Simon
       Bruce Simon (BS 2597)              Brian A. Powers (*pro hac vice* to be filed)
       Oriana Vigliotti (OV 6784)         Jennifer R. Simon (*pro hac vice* to be filed)
       **COHEN WEISS & SIMON LLP**        **O'DONOGHUE & O'DONOGHUE LLP**
       330 West 42nd Street               4748 Wisconsin Avenue, N.W.
       New York, NY  10036                Washington, DC  20016
       (212) 563-4100                     (202) 362-0041
       Fax: (212) 695-5436                Fax:  (202) 237-1200
       E-mail:  bsimon@cwsny.com          E-mail: bpowers@odonoghuelaw.com
                ovigliotti@cwsny.com              jsimon@odonoghuelaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of August, 2008, I caused the foregoing Notice of

Motion to Dismiss and Memorandum in Support thereof to be filed using the CM/ECF.


   /s/ Oriana Vigliotti_____
Oriana Vigliotti